[No. 6007–1. Division One. April 23, 1979.]

TRUCK INSURANCE EXCHANGE, *Respondent*, v. DENTON
H. MERRELL, ET AL, *Respondents*, STONEWALL
INSURANCE COMPANY, *Appellant*.

*Skeel, McKelvy, Henke, Evenson & Betts, Michael Mines,* and *John T. Ochs,* for appellant.

*Kane, Vandeberg & Hartinger, Harold T. Hartinger, Helsell, Fetterman, Martin, Todd & Hokanson, David F.*

*Jurca, Sweet, Dussault & Neff,* and *John Sweet,* for respondents.

DORE, J.—Plaintiff, Truck Insurance Exchange (Truck) brought this action to obtain a declaratory judgment that there was no coverage under its insurance policy issued to Denton H. Merrell, d/b/a Denny Merrell Construction Company (Merrell) in connection with claims brought against Merrell by Publishers Forest Products Company of Washington for damages from a forest fire which allegedly had been caused by Merrell's negligence. The trial judge held for the plaintiff, excluding coverage under Truck's policy for damage. This appeal follows.

### ISSUES

1. Whether the trial court erred in finding that plaintiff Merrell's slash disposal operation was excluded from coverage under Truck's policy exclusionary endorsement?

2. Did the trial court err when it based certain of its findings of fact upon Lloyd's policy which it refused to admit into evidence?

3. Did the trial court err in admitting the Stonewall liability policy into evidence?

4. Did the trial court err when it compared the definitions of "logging" operations in the Lloyd's and Stonewall policies?

### FACTS

Merrell was a contractor whose business included land clearing, roadbuilding and some logging. In May 1971, Merrell approached insurance agent Rossman to apply for a comprehensive liability insurance policy for his business. Rossman informed Merrell that Truck did not write property damage insurance for logging work. Through Rossman, Merrell obtained a policy from Lloyd's of London covering his logging operations. A liability policy was also secured from Truck expressly covering "land clearing." The Truck

policy, in a separate typewritten endorsement, stated:

> In consideration of the reduced rate it is understood and agreed that such coverage as is afforded by B–1 (damage to property, except automobile) does not apply to operations necessary and incidental to pulp cutting, logging or lumbering or land or road grading.

The Truck policy also contained an "other insurance" clause governing the effect of the policy when the insured is also covered by other insurance.

In May 1972, Merrell renewed the Truck policy but permitted the Lloyd's policy to lapse. In March 1973, Merrell contracted with Publishers Forest Products Company (Publishers) to pile and burn logging debris, "slash," resulting from timber cutting operations on land owned by Publishers. Publishers had previously obtained logger's broad form property damage insurance from Stonewall Insurance Company (Stonewall) covering its contractors, including Merrell. The Stonewall and Lloyd's policies both define "logging" while the Truck liability policy did not.

The Stonewall policy also contained an "other insurance" clause. In addition, the contract between Publishers and Merrell provided "coverage under Logger's Property Damage Form B is optional as the Company has such coverage for losses from $5,000 to $1,000,000."

On May 13, 1973, a forest fire broke out in the general area where Merrell had been working, damaging and destroying some 200 acres of timber. Publishers commenced an action against Merrell alleging Merrell's negligent performance of his work had caused the forest fire. Merrell tendered the defense of the lawsuit to Truck and Stonewall.

In this declaratory judgment action, in order to have all the interested parties before the court, Truck joined Merrell, Publishers and Stonewall as defendants. However, the real antagonists in this case are the two insurance companies, Truck and Stonewall.

DECISION

ISSUE 1:

██ In the subject case the trial court found that slash disposal is necessary and incidental to "logging" and, therefore, the endorsement in the Truck policy was effective to exclude coverage for the property damage resulting from the forest fire. If there is substantial evidence in the record to substantiate the trial court's findings, this court must accept them as verities. It is the defense's contention that "slash burning" as performed by Merrell was not an operation necessary for logging. The defense further contends the trial court's interpretation of the crucial language in Truck's exclusion as expressed in its findings was unsupported by the evidence. When a finding of the trial court is unsupported by substantial evidence, the finding is not binding on the appellate court. *Chmela v. Department of Motor Vehicles,* 88 Wn.2d 385, 561 P.2d 1085 (1977).

The court's findings of fact Nos. 10, 11, 16, and 17 are pertinent to the issue of whether or not the term "logging" includes "slash burning." This court must determine from the record whether there is substantial evidence to support these findings:

Finding of fact No. 10:

Neither Merrell nor Rossman recalls any express or specific discussion, either in 1971 when the policies were initially applied for or in 1972 when the Truck policy was renewed, concerning the windrowing, piling or burning of logging slash or concerning any technical or sophisticated definition of what operations are included in the term "logging." Merrell and Rossman discussed Merrell's insurance coverage in an unsophisticated, non–technical manner, and neither Merrell nor Rossman intended to or did confine the meaning of the term "logging" in such a way as to distinguish "reforestation" operations from "logging" operations. Merrell and Rossman intended and understood that "logging" should have a broad, unsophisticated meaning, including reforestation operations, and they intended that the Truck policy did not cover what the Lloyd's policy covered.

Finding of fact No. 11:

In the meantime, Publishers (through its parent corporation, the Times Mirror Company in Los Angeles) had obtained loggers broad form property damage insurance from Stonewall (a copy of which was admitted as trial exhibit 13) for all its contractors such as Merrell. The Stonewall policy provided the same kind of broad logging property damage coverage as the Lloyd's policy did. The Stonewall policy carried a $1,000,000 policy limit, with a $5,000 deductible.

Finding of fact No. 16:

Both the Stonewall policy obtained by Publishers and the Lloyd's policy obtained by Merrell contained the same definition of "logging" operations covered by the policy, to–wit:

"It is understood and agreed that for the purpose of this insurance, the term 'logging' is a general term which includes logging, rail–roading, log hauling, maintenance of camp sites, woodworking, the ownership and/or management of timberlands or other properties operated, managed or maintained by, for or on behalf of the Assured."

Merrell's work for Publishers fell within that definition.

Finding of fact No. 17:

There was nothing unusual about the necessity of piling and burning the logging slash in question, and such piling and burning of logging slash is normal, good forestry practice. One of the primary concerns of anyone conducting logging operations on the western slopes of the Cascade Mountains, including the area in question here, is the risk of forest fires, and disposing of logging debris by windrowing or piling and then burning it is one of the most common means of such forest fire hazard abatement and is a normal practice in the conduct of logging operations in this area. The burning permit obtained by Merrell for the slash burning in question here gave as the purpose of the burning "Forest Fire Hazard Abatement" rather than "Silvicultural Operations," "Agriculture," "Prevention of Fire Hazard," "Home Premises Debris Disposal," or "Other."

RULES OF CONSTRUCTION OF INSURANCE CONTRACT

 In interpreting the language of insurance contracts, our Supreme Court has consistently held,

In determining the intention of the parties to an insurance contract, terms used should be understood in their plain, ordinary and popular sense. *Lawrence v. Northwest Cas. Co.,* 50 Wn.2d 282, 311 P.2d 670 (1957). *The rule that contracts of insurance are construed in favor of the insured and most strongly against the insurer should not be permitted to have the effect of making a plain agreement ambiguous, and then construing it in favor of the insured. Rew v. Beneficial Standard Life Ins. Co.,* 41 Wn.2d 577, 250 P.2d 956, 35 A.L.R.2d 891 (1952). A court may not modify clear and unambiguous language in an insurance policy, *Tucker v. Bankers Life & Cas. Co.,* 67 Wn.2d 60, 406 P.2d 628 (1965), or revise the insurance contract under the theory of construing it. *Jeffries v. General Cas. Co.,* 46 Wn.2d 543, 283 P.2d 128 (1955).

(Italics ours.) *West American Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 80 Wn.2d 38, 44, 491 P.2d 641 (1971).

The trial court correctly construed the "logging" endorsement as excluding coverage for Merrell's slash disposal work. First, the language of the exclusion is unambiguous and a court may not revise an insurance contract under the theory of construing it. *West American Ins. Co. v. State Farm Mut. Auto. Ins. Co., supra.* Second, all parties used the term "logging" rather than "slash disposal." Stonewall itself defined "logging" in a broad sense in a policy covering Publishers' contractors. In a contract between Merrell and Publishers, Publishers referred to the property damage insurance for it as "loggers" Property Damage Insurance. Merrell intended the Truck and Lloyd's insurance policies to be mutually exclusive, and the Lloyd's policy defined "logging" broadly to include "slash disposal." Also, Truck's intent must be considered in construing the policy. Because of the possibility of catastrophic loss as from fire, Truck did not write logging property damage insurance. This is precisely the risk at issue here and the risk from logging that Truck sought to exclude.

■ Third, there was substantial evidence that slash disposal is part of "logging" as the term is used in the industry generally. Fourth, the language of the exclusion only required that operations be incidental *or* necessary to logging. Slash burning is undoubtedly incidental to logging. It is also "necessary" where that word is used in the legal sense of "appropriate."

The trial judge in his oral opinion put a great deal of weight on the testimony of the one independent expert who testified on the subject. This was Hawley, the Supervisor of the State of Washington Division of Private Forestry, who testified as follows:

Q What kinds of work operations are included within the logging industry in the state of Washington?

A *Well, normally when I think of logging, we include such things as* cutting down the trees, breaking them into pieces, the trunks of the trees commonly called the logs, the transportation of those logs to a place of loading. Subsequently, the loading of those logs onto trucks, the transportation of those logs to a mill or a pulp mill, sawmill, whatever. And then the creation of a clean landing for fire protection purposes, *the subsequent disposal of the slash,* the creation of fire trails around the logging area in the case of clearcut operations.

On occasion, the compartmentalization of the slash, the knocking down of the snags, the dead trees, because they are a fire hazard. On some occasions, the creation of water holes for fire suppression or prevention purposes. That's pretty much that whole ball."

(Italics ours.) Hawley also explained that fire protection is an essential ingredient of the logging business and that the principal reason for slash disposal is to reduce the fire hazard:

Q To what extent would you say fire protection is an essential ingredient of the logging business?

A It's an extreme essential portion of it because the occurrence of fire is historically in association with logging operations itself. The department also has that responsibility in maintaining the proper kind of prevention activities on logging operations, such things as

fire trucks, water trucks available to suppress any fires that may start; the creation of fire breaks, the immediate abatement requirement of slash close to public roads or buildings, fire extinguisher on all the equipment, et cetera.

. . .

Q What are the principal reasons for disposing of logging slash?

A Well, there's really two reasons. Number one, as I mentioned, is the reduction of hazard, the possibility for any fires to be transported by that burnable material from the point of origin to somebody else's timber or reforestation, the area of reproduction, if you would, that whole worry as far as fire protection.

Hawley testified that slash disposal is a normal logging requirement in Western Washington.

Q *To what extent is the disposal of logging slash generally understood within the logging industry in Western Washington to be a normal part of the logging business?*

A *Well, my experience has led me to believe that it's a normal part of the logging requirements.*

(Italics ours.)

Publishers was required by law to dispose of the slash created by their logging operations of the previous year. RCW 76.04.310; RCW 76.04.370; *State v. Loertscher,* 64 Wn.2d 340, 391 P.2d 520 (1964); *State v. Anacortes Veneer, Inc.,* 57 Wn.2d 886, 360 P.2d 341, 90 A.L.R.2d 863 (1961). Publishers' written contract with Merrell, in addition to the oral modification, required Merrell to pile and burn the logging slash. Merrell obtained a burning permit from the Department of Natural Resources with the express purpose being for "forest fire hazard abatement." Since Publishers' duty to dispose of its logging slash was required by statute, such disposal of logging slash by Merrell was necessary and incidental as a matter of law to logging or lumbering.

From reading the record and examining exhibits, we conclude there was substantial evidence in the record to substantiate the court's findings. We hold the trial judge was correct in finding that Merrell's slash disposal activities

were necessary and incidental to logging or lumbering and, therefore, coverage for fire damage was excluded under the Truck policy.

ISSUE 2: Did the trial court err when it based certain of its findings of fact upon Lloyd's policy which it refused to admit into evidence?

█ No. First, the Lloyd's policy was relevant and admissible and should not have been excluded by the trial court. The description of "logging" contained in Lloyd's policy was relevant to the determination of the parties' intent in adopting the logging exclusion to the Truck policy. *Aetna Ins. Co. v. Kent,* 85 Wn.2d 942, 540 P.2d 1383 (1975). Since Lloyd's policy was erroneously excluded, it may be considered by this court in assessing the substantial evidence supporting the trial court's judgment. Second, each finding of fact "referring" to Lloyd's policy is supported by substantial oral testimony about the policy, most of which was received into evidence without objection. Not having objected at trial to this testimony, Stonewall cannot now complain.

ISSUE 3: Did the trial court err in admitting the Stonewall liability policy into evidence?

No. The portion of the Stonewall policy defining "logging" was relevant: (1) as an example of the definition of "logging" contained in its standard Form B Loggers Insurance policy; and (2) as a direct admission by Stonewall as to the use of the term "logging" in logging insurance. The trial court has broad discretion in deciding the relevancy and admission of evidence. The Stonewall policy's definition of "logging" was evidentiary as to their understanding of the term.

ISSUE 4: Did the trial court err when it compared the definitions of "logging" operations in the Lloyd's and Stonewall policies?

No. Substantial oral testimony was admitted that Lloyd's policy was a property damage Form B policy. Publishers' counsel stipulated that the Stonewall policy was also a property damage Form B policy. This stipulation is binding on Stonewall. The conclusion was logically compelled that Lloyd's policy, like the Stonewall policy, defined "logging" to include "ownership and/or management of timber lands."

We find the defendants' other assignments of error to be without merit.

Affirm.

JAMES and WILLIAMS, JJ., concur.

Reconsideration denied July 9, 1979.

Review denied by Supreme Court November 9, 1979.